UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

GUALBERTO VICTORIO, et al.,

                    Plaintiffs,

      -against-

SAMMY'S FISHBOX REALTY CO., LLC, et al.,

                   Defendants.
--------------------------------------------------------------X

Docket No.: 1:14-cv-8678 (CM) (AJP)

## DECLARATION OF JOHN ARMINIO

**JOHN ARMINIO** declares the following under penalty of perjury:

**i.**    **My Employment with Defendants.**

1. I am currently employed as the general manager Defendant Sea Shore Restaurant Corp. (hereinafter "Sea Shore").

2. I have no ownership interest in any of the represented corporate Defendants.

3. I have worked for Defendants in the capacity of a general manager since in or about 2006.

**ii.**    **Defendants' Employment Policies and Procedures.**

4. In or about the year 2008, if not earlier, it has been Defendants' policy to have employees sign arbitration agreements as a condition of the employees' employment.

5. When a new employee commences employment with Defendants, they are presented with – among other things – an employment application, I-9 form, W4 form, an Employee Handbook together with its acknowledgment, and an Arbitration Agreement.

6. Though each employee is required to fill out an employment application before commencing employment and the I-9 and W4 forms upon commencing employment, the

employees are not required nor pressured to sign the employment handbook receipt and acknowledgment nor the arbitration agreement if they have questions about it or wish to have the time to read it to understand it better before signing.

7.  In fact, our Employment Handbook explicitly states: "Seashore Restaurant operates with an 'open door' policy, and all employees are invited to ask about any policies and procedures they do not understand and to make suggestions for changes.  We are happy to answer any of your questions and want to be of assistance in helping you to achieve the goals that you have set for yourself in this position."

8.  Together with general managers Joe Valenti, John Mandarino, Debra Ianello, myself, and – in the past, former general managers – we are tasked with communicating with the employees and obtaining the requisite aforementioned forms, acknowledgments, and agreements.

9.  Furthermore, before hiring any busser, I personally interview them in English to determine whether they are qualified to be a busser.  If they don't speak English, they are not qualified to be bussers.  Therefore, I know that any busser working at Sea Shore knows the English language and speaks it well.

### iii.   The Process by Which Plaintiffs Signed Their Agreements.

10. After Sea Shore instituted the employee handbooks and arbitration agreements, it became our practice and policy to present these acknowledgments and agreements to every single employee, whether they are new hires or current employees.

11. In fact, I was responsible for presenting the acknowledgments and agreements to every single Plaintiff employee in this action (except for Plaintiff Dany Cerna, who I do not believe worked for Defendants).

12. Plaintiffs Victorio, Cortez, Salas, Rodriguez, Quinonez, Veliz, Cordero, and Balbuera were all presented with employee handbooks and arbitration agreements upon being hired.

13. Because Plaintiffs Rojas, Garcia, and Romano were employees before we created the employee handbooks and instituted the relevant employment policies, those employees were presented with the employee handbooks and arbitration agreements after commencing their employment with Sea Shore when Defendants implemented these policies.

14. Generally speaking, every new employee – including Plaintiffs Victorio, Cortez, Salas, Rodriguez, Quinonez, Veliz, Cordero, and Balbuera – were personally given the documents referenced in ¶ 5, *supra*, including the arbitration agreements.

15. Whenever I hand out the above referenced documents to new employees, I explain that these documents are to be read and signed pursuant to company policy.

16. Usually, new employees read the documents and sign them, including the arbitration agreements.

17. Sometimes, new employees do not understand the documents and ask for an explanation.

18. Whenever I was asked for an explanation, I provided one to the best of my abilities.

19. Other times, new employees state that they do not understand the documents and wish to ask somebody they know outside of Sea Shore to explain it to them.

20. In other instances, new employees simply ask for a few days to review the documents before signing them.

21. I never insisted that the employees sign the documents right away, nor have I ever objected to the employees taking the time to review the documents before signing them.

22. Generally speaking, if I do not receive signed acknowledgments and agreements back within three (3) days, it would be my practice to ask the employee about the forms and inform the employee that I need the signed agreement back.

23. Regardless of what happens, every new employee eventually returns – and Plaintiffs Victorio, Cortez, Salas, Rodriguez, Quinonez, Veliz, Cordero, and Balbuera did return – signed arbitration agreements.

24. With respect to existing employees – and Plaintiffs Rojas, Garcia, and Romano – they were not presented with an employee handbook and arbitration agreement upon their hire, as those policies were not yet in place when they were initially hired.  See ¶ 4, *supra.*

25. Those existing employees were presented with employee handbooks and arbitration agreements to review and sign in one of two ways:

26. Because existing employees arrive every morning on a daily basis to the front desk at Sea Shore to see what section of the restaurant they are working in, some of these existing employees received the employee handbook and arbitration agreement upon their arrival at work and I explained that these documents are to be read and signed pursuant to company policy.

27. Other existing employees received the employee handbook and arbitration agreement with their paycheck and employees were told that these documents are to be read and signed pursuant to company policy.

28. Just like with the new employees, some signed right away, others had questions and wanted an explanation from me, others had questions and wanted to ask someone outside of Sea Shore, and others asked for a few days to review the documents themselves.

29. Regardless of what happened, every existing employee eventually returned – and Plaintiffs Rojas, Garcia, and Romano did return – signed arbitration agreements.

#### iv. English and Spanish.

30. Though I speak a little Spanish, I normally communicate with the employees in English.

31. Plaintiffs' dominant language is undoubtedly – more often than not – Spanish. However, Plaintiffs – and all bussers – communicate with patrons of Defendants' restaurants in English.

32. The only instance I am aware of Plaintiffs, or any bussers, speaking to patrons in Spanish is when they are approached by a patron who initiates the conversation in Spanish. This is done primarily in an effort to earn a better tip, as Spanish speaking patrons often do when they communicate with bussers and/or waiters in Spanish.

33. Plaintiffs, and all bussers, greet patrons in English. They take drink orders from patrons in English. They accommodate patrons' requests for a multitude of things – i.e., bread, wine, baby chairs, French fries, and utensils – by communicating with the patrons in English.

34. Plaintiffs, like all bussers, are essentially quasi-waiters. They are entitled to a portion of tips earned by waiters.

35. As such, all bussers – including Plaintiff bussers – are required to speak English fluently in order to qualify for a busser position at Defendants' restaurants.

36. All the Plaintiffs have a sufficient understanding of the English language such that we, as general managers, are able to communicate with them in English and they are able to respond in English.

Dated: Bronx, New York
       January 2, 2015


**JOHN ARMINIO**