UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

GUALBERTO VICTORIO, PASCUAL ROJAS,
DANY CERNA, FRANCISCO CORTEZ, JUAN
SALAS, RODRIGO GARCIA, LAZARO
ROMANO, IDELFONSO GIL RODRIGUEZ,
KEITH QUINONEZ, and SELVIN MENDEZ
VILEZ, and other similarly situated current and
former bussers, food runners, prep cooks, and
dishwashers employed by Defendants

        Plaintiffs,

      -against-

SAMMY'S FISHBOX REALTY CO., LLC,
BRIDGE STREET RESTAURANT CORP., CITY
ISLAND SEAFOOD CO. INC., FISHBOX
RESTAURANT CORP., SEA SHORE
RESTAURANT CORP., LOBSTER HOUSE
REALTY CO. LLC, CRAB SHANTY REALTY
CO., LLC, and SAMUEL CHERNIN and JOHN
ARMINIO individually,

        Defendants.

_____x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: |
| DATE FILED: 5/6/15 |

No. 14 Civ. 8678 (CM)

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION, DENYING PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION, AND STAYING PLAINTIFFS' LAWSUIT

McMAHON, J:

    There are currently two motions before the Court: (1) Defendants' motion to dismiss the

complaint and compel arbitration, or in the alternative, to stay the lawsuit pending arbitration,

and (2) Plaintiffs' motion for conditional certification and facilitation of notice.

    For the reasons set forth below, Defendants' motion to compel arbitration is GRANTED,

and Plaintiffs' motion for conditional certification is DENIED as moot.

Plaintiffs' lawsuit is stayed pending the outcome of arbitration, so the Court can confirm any arbitral award.

## BACKGROUND

Familiarity with the underlying facts of the case, as set forth in detail in this Court's opinion dated December 12, 2014, is presumed. See *Victorio v. Sammy's Fishbox Realty Co., LLC*, 2014 WL 7180220 (S.D.N.Y. Dec. 12, 2014).

On January 2, 2015, the Defendants moved to compel arbitration. (Docket # 46.) The Court will discuss only those facts that are relevant to that motion:

In or about the beginning of 2008, the Defendants instituted a policy pursuant to which all new and existing employees had to sign an arbitration agreement as a condition of employment. (Docket # 47 at 3.)

The arbitration agreement is three pages long, and is located within the 16-page Seashore Restaurant Employee Handbook. (Docket # 81, Exhibit A.) Page 15 of the Handbook is the last substantive page of the handbook. Page 16 contains an acknowledgement that the employee has received the handbook. The three-page arbitration agreement entitled "**DISPUTE RESOLUTION – ARBITRATION AGREEMENT**" is placed between pages 15 and 16 of the handbook, as unnumbered pages. (Docket # 81, Exhibit A.) (emphasis in original.) The agreement is written in English, and sets forth the dispute resolution policy between Defendant Seashore and its employees.

The agreement provides:

> the Employee and the Company agree to submit such dispute
> or claim to the process set forth above and, as a last or final
> means of resolving any such claims or disputes, to submit the
> same to binding arbitration through and pursuant to the rules of
> the American Arbitration Association (AAA).

And the final paragraph of the arbitration agreement provides in bold font:

2

> **Employee knowingly, voluntarily and willingly agrees to
> submit any claim or dispute described above (or any other
> direct or indirect claim involving or arising from Employee's
> employment with the Company) to arbitration and hereby
> agrees to waive and forgo and [*sic*] right of entitlement that
> Employee may have had to submit such claims to a court of
> law (including the possible right to have a jury hear such
> claims or disputes) or other tribunal or agency.**

(Docket # 81, Exhibit A.) (emphasis in original.) The third page of the agreement calls for

employees to sign, date, and print their names directly below the bolded paragraph. (Docket # 47

at 4-5.) The arbitration agreement signature page is the second to last page of the handbook.

The next and final page, page 16 of the Handbook, has two paragraphs under the heading

"**RECEIPT OF EMPLOYEE HANDBOOK**." The page has two short paragraphs, which

include the following sentence:

> I understand that neither the Handbook's policies nor any
> representations made by a management representative, at the
> time of hire or subsequently, are to be interpreted as a contract
> between the Restaurant and any of its employees.

(Docket # 81, Exhibit A.) The employees were to sign below, acknowledging receipt of the

handbook.

The Defendants provided the dates on which each Plaintiff purportedly signed his

arbitration agreement (Docket # 47 at 1) and submitted copies of the signed agreements:

> Plaintiff Victorio, signed 7/16/11, Exhibit C page 40
> Plaintiff Rojas, signed 1/19/08, Exhibit E page 45
> Plaintiff Cortez, signed 5/14/12, Exhibit G page 52
> Plaintiff Salas, signed 9/01/10, Exhibit I page 59
> Plaintiff Garcia, signed 1/21/08, Exhibit K page 66
> Plaintiff Romano, signed 1/19/08, Exhibit M page 73
> Plaintiff Rodriguez, signed 3/23/12, Exhibit O page 80
> Plaintiff Quinonez, signed 3/2/12, Exhibit Q page 87
> Plaintiff Veliz, signed 4/06/09, Exhibit S page 95
> Plaintiff Cordero, signed 6/12/14, Exhibit T page 100
> Plaintiff Balbuena, signed 5/26/14, Exhibit V page 106

3

(Docket # 81.)

In support of their motion to compel arbitration, the Defendants relied on the declarations of John Arminio and Joe Valenti, two general managers at Seashore, to establish the general practices used by Seashore managers when hiring new employees and when presenting new and existing employees with the handbook and arbitration agreement.

The Defendants assert that, after 2008, it became the policy to present all candidates for employment with the handbook and arbitration agreement and to provide an explanation of those documents. Employees who had no questions would sign the documents on that day, but employees with questions would not immediately sign if they wanted time to review the documents. Defendants assert "employees are never pressured to sign the Handbook acknowledgements and Arbitration Agreements immediately." Defendants assert that it was Arminio's general practice to ask employees for the signed documents if they were not returned within three days. Although all general managers have the responsibility of giving out documents to employees, "Arminio personally presented these documents to all named Plaintiffs (except for Dany Cerna)."[1] Specifically, Defendants assert that Arminio presented the documents to Plaintiffs Victorio, Cortez, Salas, Rojas, Garcia, and Romano upon their hire.

Although Spanish is the native language of all Plaintiffs, the Defendants assert that they all communicate with management and patrons in English.

Plaintiffs Rojas, Garcia, and Romano were already employed when the new policy was instituted in 2008. According to Defendants, the existing employees at the time of institution were given the arbitration agreement either "at the front desk when they arrived in the morning

---

[1] At the time of Defendants' motion to compel arbitration, there was some confusion surrounding the identity of Plaintiff Dany Adalberto Estrada Cerna: Cerna's arbitration agreement was signed "Danny Estrada," his Facebook profile is under the name "Dany Adalberto," and he joined this lawsuit as "Dany Cerna."

4

to see what section of the restaurant they are to work in for the day," or "together with their pay check."

There was also a mandatory staff meeting, held on January 19, 2008, to introduce the new policy to existing employees; several witnesses, including Laverne Antoine, testified about that meeting, and stated that nearly all employees were in attendance.

In opposing the Defendants' motion to compel arbitration, the Plaintiffs originally submitted that "none of the ten Plaintiffs who submitted declarations recall signing an arbitration agreement," and that two of the Plaintiffs "have declared that the signatures on the agreements are not theirs." (Docket # 78 at 1-2.) Despite having no recollection of signing an arbitration agreement, the other eight Plaintiffs submitted declarations in which they described signing documents they did not understand under "circumstances which were both coercive and deceptive."

According to the Plaintiffs, the signed agreements are procedurally unconscionable because all new hires were told that the documents "were part of the employment application, and all were directed to sign the documents, as well as to fill out the employment application on the spot." The employees who were already working at Seashore prior to the institution of the agreement "were almost all directed to sign the arbitration agreement and the handbook in the dining area, in the middle of their shift, without having any understanding of what they were signing."

The Plaintiffs assert that the agreements are substantively unconscionable because they do not bind the managers to arbitrate.

Finally, the Plaintiffs argue that the agreements were procured by fraud, because Plaintiffs were either told they were signing papers as part of the employment application, or they were told they were "work papers" to be signed on the spot.

By order dated February 26, 2015, this Court set a hearing for March 19, 2015, to resolve the issues of forgery as to Plaintiffs Victorio and Balbuena, to make credibility findings as to the circumstances under which the Plaintiffs signed arbitrations agreements, and to discern what efforts were made by Plaintiffs, if any, to ascertain the meaning of the documents they were signing. (Docket # 96.)

The hearing was adjourned until April 1, 2015. (Docket # 98.)

## THE HEARING

## I.   Plaintiffs' Testimony at the Hearing

Counsel for Plaintiffs advised at the outset of the hearing that they were no longer pursuing the forgery issue as to the arbitration agreements signed by Plaintiffs Victorio and Balbuena.

Plaintiffs Gualberto Victorio, Juan Salas, Selvin Mendez Veliz, Vicente Torres Balbuena, Julio Juarez Ybaceta, Jose Cordero, and Keith Quinonez did not testify at the hearing. Of those Plaintiffs who did not testify, Victorio, Salas, Veliz, and Balbuena submitted declarations; Ybaceta, Cordero and Quinonez did not.

Plaintiffs Dany Adalberto Estrada Cerna, Francisco Cortez, Rodrigo Garcia, Pascal Rojas, Idelfonso Gil Rodriguez, Alexander Jaimes, and Lazaro Romano testified at the hearing. All of the testifying Plaintiffs submitted declarations, other than Jaimes. The Plaintiffs testified as follows:

A. Dany Adalberto Estrada Cerna

6

Cerna signed an arbitration agreement on April 7, 2013. (DX AA.)

Cerna adopted his declaration (PX 1, Docket # 73) which stated that he has a limited ability to write, read and speak English. He moved to the United States in 2007 and was interviewed by Arminio in late 2012 or early 2013. He testified by declaration that a week after beginning employment he was given documents to sign "as part of the application process." He has no recollection of signing a mandatory arbitration agreement.

At the hearing, Cerna testified that he has taken approximately seven months of English classes since he moved to America. He has never filed a tax return, he has no bank account or credit cards, and he did not sign a lease to rent his apartment. He does have a cell phone, which required signing paperwork in English. Cerna testified that he had someone translate the paperwork for him in the store, but he did not understand it fully. He testified that he understands that when he signs a document it signifies that he agrees to the items in the document.

Cerna testified that Arminio interviewed him mainly in Spanish, and that he had someone help him with the application form in English. He testified that he does not remember if he ever received a handbook or an arbitration agreement.

On November 4, 2014, Cerna had a Facebook conversation with Keith Trauceniek, a Seashore manager, and the conversation was in English. The message chain begins with Keith saying "What up dude," to which Cerna responded "Nothing just trying to know about my friends   Do u know who am I right." The conversation continued with a few back-and-forth messages. Two days later, Trauceniek messaged Cerna saying "Danny. John says for you to stay home buddy. No busy. Mucho Rain." Cerna responded, "Understand. Im gonna stay home alright." (DX BB.)

B. Francisco Cortez

7

Cortez signed an arbitration agreement on May 14, 2012. (DX GG.)

Plaintiff Cortez adopted his declaration as his testimony. (PX 2, Docket # 76.) In the declaration, Cortez testified that he immigrated to the United States in 1970. He testified that his ability to speak and understand English is limited, and he cannot read or write in English. He testified that he was interviewed at Seashore in May 2012 by Arminio; Cortez states in his declaration that he was handed various documents and was told he had to sign them as "part of the application process;" he was not given time to review them and he felt pressured to sign them on the spot.

Cortez testified at the hearing that he has been in the United States since 1970, but he still cannot speak English. He testified that he filled out paperwork at the DMV in Spanish, and that he uses a Spanish speaking accountant. He testified that he typically seeks an explanation for documents that he does not understand in English.

Cortez testified that when he was interviewed by Arminio, the interview began in English but was then conducted in Spanish. At the restaurant, he worked as a prep cook, receiving the food orders as they were entered into the computer and printed out in English. On his resume, Cortez states that he is bilingual, speaking English and Spanish. (DX HH.) He testified that it is true in part, but his daughter made the resume on his behalf.

Cortez does not recall ever signing a handbook or arbitration agreement.

C. Rodrigo Garcia

Garcia signed an arbitration agreement on January 21, 2008. (DX HHH.)

Plaintiff Garcia adopted his declaration as his testimony. (PX 3, Docket # 77.) Garcia testified that he immigrated to the United States in 2000; he has a limited grasp of the English language and can only understand some written English. Garcia posts on his Facebook in both

8

English and Spanish. He testified that he sends text messages primarily in Spanish, with some words in English. He has no driver's license and no bank account. He rents an apartment, but the lease agreement was in English and in Spanish. He goes to an office to prepare taxes in Spanish.

Garcia testified that he was interviewed by John Mandarino[2] in 2006, and he filled out an application a week after being hired. He was asked a few phrases in English before being hired.

In his declaration he described being busy at work on January 21, 2008, when he was summoned by Mandarino to sign papers that he later learned was an arbitration agreement. "I asked Mr. Mandarino what the papers were and he said they had to do with work." He then described Mandarino flipping to two places where he had to sign, and Mandarino did not give him an opportunity to review the documents before signing at once.

Garcia signed a form in English explaining that he was required to report the tips he receives. (DX DDD.) Garcia testified that a waiter helped him understand the form and fill it out.

As part of his job, Garcia is required to set up the party room for special events. All the party room details are written in an English contract. Garcia testified that Arminio explains the contracts to him in Spanish, and the head waiter is also there to explain a few words in English. He testified that he speaks "very little" in English.

Regarding the arbitration agreement, Garcia testified that he was summoned by Mandarino to the front desk when he was told he had to sign some papers and Mandarino ripped out the back two pages. Garcia testified that he asked what type of documents they were, and he was told "it is part of your job." He later learned it was an arbitration agreement.

Garcia does not recall being at a meeting explaining the arbitration agreement. He testified that he was busy on the day that he was told to sign the papers that turned out to be an

---

[2] Garcia did not specify whether he was referring to Mandarino Jr. or Mandarino Sr. However, Mandarino Sr. testified that he hired Garcia.

9

arbitration agreement, because it was Martin Luther King's birthday, so the restaurant was busy even though it was a Monday.

Garcia also testified about being asked to sign another document in December 2014. He testified that he went to get his paycheck from the bartender on one Saturday, and "Luis, the bartender, said that we had to sign a paper in order to receive our checks." Garcia refused to sign the papers, following advice of counsel in this lawsuit not to sign any more papers. He testified that the restaurant withheld his check for four days. Garcia explained that his friend tried to translate the document for him into Spanish, and he learned that it was another arbitration agreement.

D. Pascal Rojas

Rojas signed his arbitration agreement on January 19, 2008, the day of the mandatory staff meeting. (DX V.)

Plaintiff Rojas adopted his declaration as his testimony. (PX 5, Docket # 71.)

According to the declaration, Rojas immigrated to the United States in 2007. He has a limited ability to speak and understand English; he can read only some words but not full sentences, and he cannot write in English.

According to Rojas, he has been working at the Seashore since 2007, but was paid off the books until 2009. When he was filling out his employment application he had an English-speaking friend fill out the form in pencil so he could trace over it in pen.

At the hearing, Rojas was given a Spanish W-4 form which he had signed. He initially failed to recognize it, testifying that he does not understand English, until he realized it was in fact written in Spanish. Rojas also signed an English document requiring him to report the tips

10

that he earns. (DX S.) At the hearing, he testified that he was given the form by a manager during a very busy shift and required to sign it at once.

Rojas testified that on January 19, 2008, Mandarino called him over for two minutes during a very busy shift to show him a big packet of papers. He testified that Mandarino flipped to the last two pages, told him to sign it quickly, and did not explain the content. Rojas testified that he was concerned about his job if he did not sign quickly. He did not recall being at a meeting on January 19, 2008, testifying that he was given the papers alone.

E.  Idelfonso Rodriguez

Rodriguez signed an arbitration agreement on March 23, 2012 (DX ZZZ.)

Plaintiff Rodriguez adopted his declaration as his testimony. (PX 6, Docket # 68.) According to his declaration, Rodriguez lived in the United States from 1988 until 2000, and has been back in the United States since 2002. He worked at Seashore from 1994 until 2002, and then from 2012 until the present.

In 2012, Arminio interviewed him in Spanish because Rodriguez speaks essentially no English. Rodriguez stated that Mr. Arminio filled out his application on his behalf because he does not understand English; when he had to fill out a tax form a manager acted as a translator and wrote down his answers. Rodriguez asserts that Yolanda, a hostess, brought a paper to him in the kitchen and required that he sign it right away without giving him time to review it.

Rodriguez testified that he has a Spanish-speaking professional prepare his taxes for him every year. Rodriguez is not sure that he signed a receipt for the handbook and the arbitration agreement on March 23, 2012; he testified that he was not sure if the signatures on these documents are his. He testified that he was told to sign some documents during work hours, but does not know anything specific.

11

F.  Alexander Jaimes

Jaimes signed an arbitration agreement on June 18, 2011. (DX QQQQ.)

Plaintiff Alexander Jaimes adopted his declaration as his testimony. (PX 8.) Jaimes
worked as a busser at Seashore for 4 years. He has been in America since he moved from Peru in
2011. He testified that he was interviewed in May 2011 by Arminio, and at the time he only
spoke Spanish. He was given employment documents a few days after the interview.  He
testified that his signature on DX QQQQ looks very different from his actual signature, and he
does not remember signing an arbitration agreement.

G.  Lazaro Romano

Romano signed his arbitration agreement on January 19, 2008, the day of the mandatory
staff meeting. (DX RRR.)

Plaintiff Romano adopted his declaration as his testimony. (PX 9, Docket # 75.)
According to his declaration, Romano has been working as a busser at Seashore since 1990. He
asserts that he has a limited ability to speak and understand English and can read very little
English.

At the hearing, Romano testified that he has been working at the Seashore for 20 years
and he has filled out various W-4 documents over the years. He testified that when the restaurant
wants an employee to sign papers, they follow him and ask him to sign it, even if he asks what it
is. He testified that they usually approach employees when they are busy, and say sign here.

Romano stated that, on January 19, 2008, he was handed a piece of paper during a busy
shift and was told he had to sign it on the spot, without even five minutes to review it. Romano
testified that he recalled the last two pages of the handbook being ripped out, and he was given
the handbook to keep. He testified that did not receive the handbook at a meeting on a Saturday

12

in the Captain's room. He testified that he never went back to read the handbook because he had already signed for it.

## II.   Defendants' Testimony at the Hearing

On behalf of the Defendants, John Mandarino Jr., Laverne Antoine, Keith Trauceniek, John Mandarino Sr., and John Arminio testified.

### A.  John Mandarino Jr.

John Mandarino Jr. is a part-time manager at Seashore.

Mandarino testified that Cerna was promoted from being a dishwasher to working in the kitchen, and he now prepares the cold items that are ordered. Mandarino testified that he works with Cerna in the kitchen and calls out orders to him in English, and the orders are printed out in English for him to read.

Mandarino testified that Cortez worked the fryer and he also received the entire order as it printed, and then had to pass the print out to the right sections in the kitchen depending on the order.

Mandarino testified that Rodriguez handles the receivables, making sure deliveries to the restaurant match the invoice. The invoices are written in English.

Mandarino did not recall whether he actually interviewed any of the Plaintiffs in this case. However, he did testify as to his general interviewing and hiring practice: when an individual comes in to the restaurant he is interviewed and fills out an application, and the individual then begins a three-day training period. If it seems that he is going to work out for hire, Mandarino provides the individual with an I-9, W-4, and handbook. Mandarino testified that he speaks English when interviewing potential employees and has never hired someone who

13

spoke no English. He testified that he has never given an employee documents in the middle of a shift.

Mandarino testified that he speaks with Cerna in English about working out, and speaks with Jaimes about girls. He posts announcements on the bulletin board in English, and has an email chain that gets sent to many employees. The emails are in English.

Regarding his general practice for new hires, Mandarino testified that he explains that the handbook contains an arbitration agreement, and if the employee asks him for more information he provides a detailed explanation. Mandarino did not work at Seashore when the arbitration agreement was instituted in 2008.

B. Laverne Antoine

Laverne Antoine testified that she has worked as a waitress at Seashore for almost 20 years. She does not speak Spanish, but knows all the Plaintiffs and is able to converse with them at work. Antoine testified about attending a mandatory meeting on January 19, 2008 where she received and signed a new handbook and arbitration agreement. She could not recall whether any of the Plaintiffs were present at that meeting.

She testified that she has never been pressured into signing any documents at Seashore.

C. Keith Trauceniek

Keith Trauceniek, a head waiter and manager at Seashore, testified that he has worked at the restaurant for four years. He testified that when he was given an arbitration agreement, he was told to take his time to sign the documents, but he returned them signed on the same day.

Trauceniek was not employed at Seashore in 2008, but testified that there are quarterly mandatory meetings held at the restaurant. Trauceniek explained that when the restaurant

14

schedules a mandatory meeting, an employee is expected to show up for the meeting even if he is not scheduled to work at that time.

He testified that he is able to speak to all the Plaintiffs in English. He testified that Romano and Garcia are the busboys for the party room, and they are required to set up the room by reading the party contract with all the details in English. He has spoken to Cerna in English on Facebook, and spoke to Cortez in English before he quit. Trauceniek testified that Plaintiff Julio Ybaceta is his personal busboy with whom he speaks in English regularly. Jaimes is another busboy who he works with regularly.

Trauceniek has no firsthand knowledge of the circumstances under which any of the Plaintiffs were given arbitration agreements.

D.  John Mandarino Sr.

John Mandarino Sr. testified that he began working at Seashore in 1980, and was a general manager from 1987 until 2010. Since 2010, he works at Seashore part time. He testified that as general manager he was responsible for hiring and firing employees, and he personally hired Plaintiffs Romano and Garcia.

Generally, when he meets with a potential new hire, he asks what kind of job the individual is looking for and then provides the individual with an application. Most people fill it out on the spot, but some take it home with them. After filling out the application, he gives them a quick interview. After the interview, Mandarino frequently has the individual start trailing right away, and then after a day or two of training he gives out the I-9 and W-4. Mandarino testified that he would explain how to fill out the two forms and most employees would take them home to fill it out.

Mandarino testified that he never hired an employee who could not speak English.

15

He testified that the employees have to bring back the paperwork by the weekend to be placed on payroll. He testified that once an employee was working on the floor, he presents him with a handbook.

Mandarino explained that the restaurant first instituted handbooks in 2006, and then revised the handbook in 2008 to include the arbitration agreement. He testified that he posted a notice of a mandatory staff meeting a week in advance to give everyone the new handbook. He testified that there was a meeting on January 19, 2008 where the arbitration agreements were passed out. Many employees returned their signature pages on that day, and several other employees returned signed pages several days after. Only three of the named plaintiffs were employed at Seashore at the time of the January 2008 meeting, but Mandarino did not recall whether any of them were present at the meeting.

Mandarino testified that, once the handbook was instituted, he would hand it to an employee on his first day of work. He testified that he would explain the handbook generally and would explain the open-door policy to ask questions if they needed further explanation. Mandarino testified that the employees were able to take the handbook home, but they were then required to acknowledge receipt of the handbook and arbitration agreement.

E. John Arminio

John Arminio adopted his declaration (PX 10, Docket # 49), in which he wrote that he was responsible for presenting the handbook and arbitration agreements to every single plaintiff in this action. However, Arminio testified that while it was ultimately his responsibility to ensure that employees received and signed paperwork, he does not recall if he personally gave the papers to the plaintiffs. He testified that he frequently delegated those responsibilities to other managers.

16

Arminio testified that he speaks to the Plaintiffs in English and in Spanish, but mostly in English, to encourage them to learn the language.  He testified that when a new employee is first hired they go through training before he gives out the I-9, W-4, and handbook with the arbitration agreement. The papers all have to be returned with two forms of identification on the next scheduled day of work. He testified that employees frequently forget to bring the documents back right away, so he reminds them to hand it all in by Sunday to be processed on payroll and get paid on Monday.

Arminio testified that some existing employees received the employee handbook and arbitration agreement with their paychecks. Arminio could not testify about the circumstances under which any of the named Plaintiffs received the handbook and arbitration agreement.

## DISCUSSION

### I. Legal Standard

The Federal Arbitration Act was enacted "to replace judicial indisposition to arbitration," *Hall St. Ass'n, LLC v. Mattel, Inc.*, 552 U.S. 576, 581 (2008), and it "is an expression of 'a strong federal policy favoring arbitration as an alternative means of dispute resolution.'" *Ross v. Am. Express Co.*, 547 F.3d 137, 142 (2d Cir. 2008) (quoting *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001)). An agreement to arbitrate is "valid, irrevocable, and enforceable" under the Federal Arbitration Act. 9 U.S.C. § 2.

Arbitration agreements are contracts, "on equal footing with other contracts," so courts must "enforce them according to their terms." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (internal citation omitted). Indeed the purpose of the FAA was "to make arbitration agreements as enforceable as other contracts, *but not more so*." *Opals on Ice Lingerie v. Body Lines Inc.*, 320 F.3d 362, 369 (2d Cir. 2003) (emphasis in original) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967). "That said, a party may be compelled to arbitrate a dispute only to the extent he or she has agreed to do so." *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 569 (S.D.N.Y. 2009) (citation omitted). "'Generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements' in accordance with § 2 of the FAA." *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566 (S.D.N.Y. 2009) (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

There are four factors that the court must consider when deciding a motion to compel arbitration:

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if

18

> federal statutory claims are asserted, it must consider whether
> Congress intended those claims to be nonarbitrable; and fourth, if
> the court concludes that some, but not all, of the claims in the case
> are arbitrable, it must then decide whether to stay the balance of
> the proceedings pending arbitration.

*Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75-76 (2d Cir. 1998).

"In the context of motions to compel arbitration brought under the Federal Arbitration

Act . . . , the court applies a standard similar to that applicable for a motion for summary

judgment. If there is an issue of fact as to the making of the agreement for arbitration, then a trial

is necessary." *Bensadoun v. Jobe–Riat,* 316 F.3d 171, 175 (2d Cir. 2003). However, "If the party

seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party

opposing may not rest on a denial but must submit evidentiary facts showing that there is a

dispute of fact to be tried." *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir.

1995).

Plaintiffs oppose Defendants' motion to compel arbitration based on the first *Oldroyd*

factor. *See Oldroyd*, 134 F.3d at 75. When the claim is "an issue which goes to the 'making' of

the agreement to arbitrate—the federal court may proceed to adjudicate it." *Prima Paint Corp v.

Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967). Thus the question before the court is

whether the parties entered into agreements to arbitrate.

## II.    The Plaintiffs Agreed to Arbitrate

The party seeking to compel arbitration "must make a prima facie initial showing that an

agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the

making of that agreement 'in issue.'" *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir.

2010). To satisfy the initial burden, the moving party need not establish that "the agreement

would be *enforceable*, merely that one existed." *Id.* (emphasis in original).  Once the party has

19

made a prima facie showing that an agreement existed, the party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp. – Alabama v. Randolph*, 531 U.S. 79, 91-92 (2000)). *See also Schreiber v. K-Sea Transp. Corp.*, 849 N.Y.S.2d 194, 196 (2007).

Since arbitration agreements are considered contracts, *Nat'l Credit Union Admin. Bd. v. Goldman, Sachs & Co.*, 775 F.3d 145, 148 (2d Cir. 2014), whether the parties entered into a binding arbitration agreement is governed by state contract law principles. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 27 (2d Cir. 2002).

"[T]o create a binding contract, there must be a meeting of the minds." *Highland HC, LLC v. Scott*, 113 A.D.3d 590, 594 (N.Y.App.Div. 2014). However, it is settled under New York law that "a party will not be excused from his failure to read and understand the contents" of a document. *Johnson v. Thruway Speedways, Inc.*, 407 N.Y.S.2d 81, 83 (N.Y. App. Div. 1978). The general rule under New York law is that "a party who executes a contract is considered bound by the terms of that contract." *Stern v. Espeed, Inc.*, No. 06-civ-0958, 2006 WL 2741635, at *2 (S.D.N.Y. Sep. 22, 2006).

"An inability to understand the English language, without more, is insufficient to avoid this general rule." *Maines Paper & Food Service Inc. v. Adel*, 681 N.Y.S.2d 390, (N.Y. App. Div. 1998). But, "If the signer is illiterate, or blind, or ignorant of the alien language of the writing, *and the contents thereof are misread or misrepresented to him by the other party*, or even by a stranger, unless the signer be negligent, the writing is void." *Pimpinello v. Swift & Co.*, 253 N.Y. 159, 163 (1930) (emphasis added).

By supplying the Court with copies of each Plaintiff's signed arbitration agreement (Docket # 81), the Defendants satisfied their initial burden of establishing agreements to arbitrate. *See Scone Invs., L.P. v. Am. Third Mkt. Corp.*, 992 F. Supp. 378, 381 (S.D.N.Y. 1998). Thus, the burden shifted to the Plaintiffs to successfully avoid arbitration. *See Hines*, 380 F. App'x at 24.

In opposition to Defendants' motion to compel arbitration, ten of the Plaintiffs submitted declarations, which put the making of their arbitration agreements "in issue." *See Hines*, 380 F. App'x at 24.

Plaintiffs Ybaceta and Cordero did not submit declarations in opposition to Defendants' motion and did not testify at the hearing. Therefore there is nothing to put the making of their agreements in issue. They must arbitrate their claims.

Similarly, by abandoning the forgery claims that Plaintiffs Victorio and Balbuena asserted in their declarations, and then not testifying at the hearing about the making of their agreements, there is nothing in the record except their assertion that they "do not recall" signing an arbitration agreement. Victorio claimed to have "no recollection of ever receiving from Mr. Arminio an employment handbook or an arbitration agreement." (Docket # 74.) Balbuena claimed that "at no point throughout my employment at the Seashore Restaurant was I asked to sign any documents whatsoever." (Docket # 69.) Those allegations, without more, are insufficient to challenge the existence of the agreements—especially where, as here, Plaintiffs abandoned a forgery challenge to the validity of their agreements.

Plaintiffs Salas and Veliz did not testify at the hearing, but they submitted declarations in opposition to Defendants' motion to compel arbitration. Salas declared that he was called to the sushi stand during a shift to sign some paperwork, and that he was not given a chance to review

21

the document. Rather he declared that he was directed to where they wanted his signature and told to sign. (Docket # 70.) Veliz declared that he does not recall signing an arbitration agreement per se, but he recalls a time when Yolanda, a hostess at Seashore, came into the kitchen to have him sign for a document without reviewing it. (Docket # 72.) These declarations, without more, do not raise any genuine issue of fact. The two men did not testify that they asked what the documents said and were refused explanations, or that the documents were affirmatively misrepresented to them.  Immigrants and native Spanish speakers or not, the onus was on them at least to try to understand what they were signing—they too must arbitrate.

As to the Plaintiffs who testified at the hearing, Plaintiffs' counsel suggests that the Court should find that there were no valid agreements to arbitrate, as there was no meeting of the minds. Plaintiffs' counsel argues that Plaintiffs were deprived of sufficient time to review the documents, and that those Plaintiffs who were already on the payroll in 2008 were misled into believing the agreement was part of the employment application process. (Docket # 108.)

In their opposition to Defendants' motion, Plaintiffs initially advanced two theories as to why this Court should find the agreements void: first, that the arbitration agreements are unconscionable, and second, that they were induced by fraud. Neither works.

### A. The Agreements Were Not Unconscionable

"Under New York law, a contract is unconscionable when it is 'so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable [sic] according to its literal terms.'" *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009) (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988)).  "A contract generally is unenforceable by reason of unconscionability only if it was both procedurally and substantively unconscionable when made." *Benson v. Lehman Bros.*

22

*Inc.*, No. 04 Civ. 7323(DLC), 2005 WL 1107061, at *2 (S.D.N.Y. May 9, 2005). "The

procedural element of unconscionability concerns the contract formation process and the alleged

lack of meaningful choice; the substantive element looks to the content of the contract." *Ragone

v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121-22 (2d Cir. 2010) (quoting *Nayal*, 620 F.

Supp. 2d at 571.)

      To determine whether an agreement to arbitrate was procedurally unconscionable, a court

should take a "flexible" approach and consider all the facts and circumstances surrounding the

making of an alleged agreement. *See Brennan v. Bally Total Fitness*, 153 F. Supp. 2d 408, 416

(S.D.N.Y. 2001). Relevant factors to consider include the commercial setting of the transaction,

the experience and education of the parties, disparity in bargaining power, as well as whether

"deception, high-pressured tactics, and the use of fine print" were used to deprive the

disadvantaged party of a "meaningful choice." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d

775, 787 (2d Cir. 2003) (citations omitted).

      It is beyond dispute that "[m]ere inequality in bargaining power . . . is not a sufficient

reason to hold that arbitration agreements are never enforceable in the employment context."

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991); *see also Nayal*, 620 F. Supp.

2d at 571. But unequal bargaining power "when coupled with high pressure tactics that coerce [a

signatory's] acceptable of onerous terms, may be sufficient to show that [the signatory] lacked a

meaningful choice." *Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 382 (S.D.N.Y. 2002)

(citations omitted).

      However, that the Plaintiffs felt they had to sign the agreement in order to keep their jobs

does not make the agreement unconscionable. "[E]ven if the Agreement was a form contract

offered on a 'take-it-or-leave-it' basis and [the party] refused to negotiate the Arbitration

23

Provision, this is not sufficient under New York law to render the provision procedurally unconscionable." *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009) (collecting cases). "The mere fact that an agreement to arbitrate was required as a condition of employment, or continued employment, also is insufficient to invalidate the provision." *Ciago v. Ameriquest Mortg. Co.*, 295 F. Supp. 2d 324, 239 (S.D.N.Y. 2003).

All of the Plaintiffs are Spanish-speaking immigrants with little education and limited resources. Testimony at the hearing revealed that most, if not all, of the Plaintiffs are capable of conversing in English to a limited extent. The Plaintiffs all assert that when they were handed the documents they felt pressured to sign documents on the spot without a chance to review them. However, there is no evidence that high pressure tactics were used to cause the Plaintiffs to feel that they had no choice but to sign on the spot without reviewing the terms. This Court does not doubt that they were worried about     losing their jobs, but there is no evidence that anyone actually uttered such a threat; furthermore, even if someone had, that would not be enough to make the agreement unconscionable.

Even assuming *arguendo* that the Plaintiffs could establish that the agreements were procedurally unconscionable, a defense of unconscionability requires both procedural and substantive unconscionability. Substantive unconscionability exists when the terms are "grossly unreasonable" by favoring the party seeking to enforce the contract. *See Isaacs v. OCE Bus. Servs., Inc.*, 968 F. Supp. 2d 564, 569 (S.D.N.Y. 2013) (citations omitted). "When both an employer and its employees are bound to an agreement to arbitrate, when the terms of the agreement are equally applicable to both parties, and when the employer bears any unreasonable cost of the arbitration, the arbitration agreement is not unreasonably favorable to the employer." *Id.*

24

Plaintiffs argue that there is no clear way to determine how much the Plaintiffs would have to pay to arbitrate their claims, and that two of the individually named Defendants are not parties to the arbitration agreement. That is insufficient to reach the level of substantive unconscionability, as the terms of the arbitration agreement are by no means "grossly unreasonable."

## B. The Agreements Were Not Induced by Fraud

In an effort to avoid the presumption that a party is bound to a document he executes, the Plaintiffs assert that the contents of the agreement were misrepresented in order to induce them to sign. In their memorandum of law, the Plaintiffs assert that "Plaintiffs who were new employees when they signed were induced to sign the arbitration agreement based upon the representation that the agreement was part of the employment application," and the existing employees "were induced to sign the agreement by the representation that the document, which was contained in a lengthy employee handbook, constituted 'work papers.'" (Docket # 78 at 20.)

Plaintiffs essentially argue that Plaintiffs were persuaded to sign without reading because Defendants misrepresented the significance of what it is they were being asked to sign. This argument boils down to an claim of fraud in the execution of a contract, or fraud in the factum, which is "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents." *Langley v. Fed. Deposit Ins. Corp.*, 484 U.S. 86, 94 (1987). If fraud in the execution were found, "it would render the instrument entirely void." *Id.* at 93. This type of fraud "occurs where there is a misrepresentation as to the character or essential terms of a proposed contract, and a party signs without knowing or having a reasonable opportunity to know of its character or essential terms." *Del Turco v. Speedwell Design*, 623 F. Supp. 2d 319, 335 (E.D.N.Y. 2009) (quoting *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 32 (2d

Cir. 1997)) (internal quotation marks omitted). To prevail on such a defense, the party must show "excusable ignorance of the contents of the writing." *Hetchkop*, 116 F.3d at 32.

Ordinarily, a claim of fraud in the execution arises when one party secretly substitutes one type of document for another, after the other party has already read the document but prior to his signing it. *See McCaddin v. Southeastern Marine Inc.*, 567 F. Supp. 2d 373 (E.D.N.Y. 2008) (citations omitted). The ignorance is then excusable by showing "that the party satisfied its basic responsibility of reading what it signed." *Id.* at 380.

So, was Plaintiffs' ignorance excusable in this case?

No, it was not.

The Plaintiffs who joined Seashore's workforce after 2008 were told they were signing work documents or documents as part of their employment application. That is not a misrepresentation—the arbitration agreement is in fact a "work paper," a paper that relates to the terms and conditions of employment. Any document that would fall under that category clearly has potential to trigger some duty to read prior to signing, or risk being bound to unfavorable terms. "If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him." *Pimpinello v. Swift & Co.*, 253 N.Y. 159, 162-63 (1930).

This Court certainly appreciates that these Plaintiffs are Spanish-speaking immigrants with imperfect grasps on the English language who did not realize exactly what they were signing. However, "New York courts have repeatedly ruled that even the fact that a prospective employee possesses an imperfect grasp of the English language will not relieve the employee of making a reasonable effort to have the document explained to him." *Ragone v. Atlantic Video at Manhattan Ctr.*, 595 F.3d 115, 122 (2d Cir. 2010). The evidence presented simply does not

suggest that any Plaintiff made such an effort. To find that the agreements are void under these circumstances would require turning a blind eye to the clearly established precedent regarding a signatory's obligation to the contract that he signs.

For example, in *Molina v. Coca-Cola Enterprises, Inc.*, No. 08-cv-6370, 2009 WL 1606433 (W.D.N.Y. June 8, 2009), an employee attempted to avoid an arbitration agreement which he signed based on an alleged inability to read or understand English. The court concluded that even if the Plaintiff were entirely incapable of reading English, "his signature on the . . . arbitration agreement would still be binding against him as his execution of an agreement of this type under such circumstances constitutes gross negligence, since he failed to seek proper assistance in understanding it before signing." *Id.* at *8 (internal citation and quotation omitted).

The Plaintiffs in this case testified that they understand that signing a document signifies an agreement to the terms of the document. These men are not strangers to the practice of seeking help from co-workers and friends when faced with filling out English documents at work:

> Cerna testified that someone helped him fill out his employment application.
>
> Cortez testified that he typically seeks an explanation for documents written in English that he does not understand.
>
> Garcia testified that he asked a waiter to help him with the tip credit form which was in English. He also testified that Arminio explains the party room contracts to him when he does not understand what is written.
>
> Rojas testified that he had an English speaking friend fill out his employment application in pencil so he could trace over it in pen.
>
> Rodriguez testified that Arminio filled out his employment application for him because he could not understand what was written in English.
>
> Jaimes' declaration states that he asked a co-worker for help filling out his W-2 form because he could not read English.

27

Not one of the Plaintiffs testified that he asked for the arbitration agreement to be translated but was denied adequate help or time to seek his own translation. Not one Plaintiff testified that he asked to take the agreement home but was denied such an opportunity.

"Ordinarily, the signer of a deed or other instrument . . . is conclusively bound thereby. That his mind never gave assent to the terms expressed is not material." *Pimpinello*, 253 N.Y. at 162. The circumstances that took place here do not rise to the level of fraud or misrepresentation to support Plaintiffs' contention that there was no meeting of the minds and through no fault of their own. This Court has no choice but to find that the Plaintiffs agreed to arbitrate.

Additionally, no reasonable efforts were made by Plaintiffs to ascertain what they had signed *after* they were given the arbitration agreement to keep.  The testimony at the hearing revealed that the signature pages for the arbitration agreement and handbook were ripped out by management and kept on file, and the handbook and agreement were given to the employee to take home. The Second Circuit has noted that under New York law, continued employment after receiving notice of an arbitration agreement is sufficient to manifest assent to the terms. *Manigault v. Macy's East, LLC*, 318 F. App'x 6, 6 (2d Cir. 2009).

So, every Plaintiff here agreed to arbitrate.

## III.   Plaintiffs Must Arbitrate With All Defendants

The question is then, with whom must Plaintiffs arbitrate?

The arbitration agreement provides: "This agreement is between The Sea Shore Restaurant Corp. (hereinafter "the company") and the Employee listed below."

The next line of the agreement provides: "The company and the Employee named below, hereby agree to submit to the following policy."

The agreement then delineates the dispute resolution and arbitration procedures. Finally, the last page of the agreement again provides:

> [T]he Employee and the Company agree to submit such disputes or claim to the process set forth above and, as a last or final means of resolving any such claims or disputes, to submit the same to binding arbitration through and pursuant to the rules of the American Arbitration Association (AAA).

By affixing their signature to the agreement, the Plaintiffs clearly agreed to arbitrate with Defendant Seashore. Keeping in mind that courts can compel arbitration only to the extent that the parties actually agreed to arbitrate, *see Nayal*, 620 F. Supp. 2d at 569, this Court must consider whether the Plaintiffs must arbitrate only with Seashore, or with the other Defendants as well.

The other defendants include Chernin (majority owner of Seashore), Arminio (who manages the restaurant at which Plaintiffs worked), and six additional corporations, also owned by Chernin, which have some interest in one or more of the five restaurants in Chernin's restaurant group (Seashore Restaurant, Fish Box, Shrimp Box, the Lobster House and Crab Santy).

Defendants Chernin and Arminio submit that Plaintiffs must arbitrate any claims against them (as owner and manager of Seashore, respectively) because of their "close relationship to the parties, the facts, and [the fact that] Plaintiffs' claims against all Defendants (for wages) are inextricably intertwined." (Docket # 89 at 9.) They argue that Plaintiffs should be estopped from refusing to arbitrate with them.

The Second Circuit has stated:

> under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of 'the relationship among the parties, the contracts they signed . . . , and the issues that had arisen' among them discloses that 'the

29

> issues the nonsignatory is seeking to resolve in arbitration are intertwined
> with the agreement that the estopped party has signed.'

*JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004) (quotations omitted).

> That does not mean, however, 'that whenever a relationship of any kind
> may be found among the parties to a dispute and their dispute deals with
> the subject matter of an arbitration contract made by one of them, that
> party will be estopped from refusing to arbitrate.'

*Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 127 (2d Cir. 2010) (quoting *Sokol*

*Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008)).

To determine if estoppel is appropriate, a fact-specific inquiry into the "tight relatedness

of the parties, contracts and controversies" is necessary. *Choctaw Generation Ltd. P'ship v. Am.*

*Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001). Where a plaintiff treats all defendants as

a single unit in his complaint, it further supports estopping that plaintiff from shielding himself

from arbitrating with certain defendants. *See Smith/Enron Cogeneration Ltd. P'ship, Inc. v.*

*Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999).

In *JLM Industries*, 387 F.3d at 178, the non-signatory defendants were the corporate

parent companies of the defendants who were parties to the signed arbitration agreement with the

Plaintiff. The Second Circuit concluded that the relationship between the parties satisfied the

"minimum quantum of 'intertwined-ness' required to support a finding of estoppel." *Id.*

The *JLM Industries* holding was later explained as, "The Plaintiff shippers were estopped

from evading their contractual delegation to arbitrate by suing the parent of the signatory to the

contract rather than the signatory itself." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d

354, 359 (2d Cir. 2008).

In *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354 (2d Cir. 2008), the Second

Circuit discussed at length its prior treatment of estoppel claims, as they relates to non-signatory

defendants seeking to compel plaintiffs who are signatories to an arbitration agreement to

30

arbitrate their claims against the non-signatories as well. The Second Circuit began by recognizing that "It is black letter law that an obligation to arbitrate can be based only on consent," and that "Persons are generally entitled to have their dispute settled by the ruling of a court of law." *Id.* at 358. The Second Circuit then analyzed its prior cases where signatories to arbitration agreements were compelled to arbitrate claims against non-signatories, ultimately concluding that those cases "simply extend [the black letter rule's] contours somewhat by establishing that the consent need not always be expressed in a formal contract made with the party demanding arbitration." *Id.* at 361-62.

That Defendants Chernin and Arminio consent to arbitrate is irrelevant—the issue is whether the relationships among the parties here developed in a manner that would make it unfair for Plaintiffs to claim that their agreements to arbitrate run only to Seashore and not to the other Defendants. *See Sokol*, 542 F.3d at 361. In other words, did the Plaintiffs implicitly consent to arbitrate with them?

Yes, there is sufficient evidence that the parties here have satisfied the minimum level of "intertwined-ness" to compel arbitration between the Plaintiffs, Chernin, and Arminio.

As to Defendant Chernin himself, as the sole owner of the restaurants that are the subject of this lawsuit, he certainly satisfies the minimum quantum of intertwined-ness necessary for a non-signatory to compel a signatory to arbitrate. Similarly, as a manager at the restaurants in question, Arminio has developed a relationship with the Plaintiffs in such a way that it is not unfair to compel Plaintiffs to arbitrate their claims with Arminio as well. Whether Arminio is in fact a proper party to this lawsuit is an entirely different question, which can be resolved by an arbitrator at a later time.

31

As for the six additional corporate defendants: they make no argument one way or the other about their susceptibility to arbitration. But—perhaps inadvertently—Plaintiffs made the argument for them. In the amended complaint, Plaintiffs allege that Chernin controls his five City Island restaurants through the seven corporate entities that are Defendants in this action. The amended complaint then state, "Defendants jointly employed Plaintiffs and similarly situated employees at all times relevant." (Docket # 43 at ¶ 54.) Then in the brief in support of Plaintiffs' motion for conditional certification of a class under 29 U.S.C. § 216(b), plaintiffs devote two and one half pages of their brief to convincing the Court that the Chernin Restaurants operate as "a single integrated enterprise," all under the control of Chernin, using the various corporations. (Docket # 91 at 5-7.) By treating all the Defendants as a single unit, Plaintiffs themselves have demonstrated the level of "intertwined-ness" needed to force arbitration of any claims Plaintiffs may have against these non-signatory corporations. *Smith/Enron Cogeneration Ltd. P'ship, Inc.*, *supra*, 198 F.3d at 98.

If the other relevant factors are satisfied, this Court will compel arbitration.

## IV.    The Other *Oldroyd* Factors Are Satisfied.

### A. The Scope of the Agreement

The next factor for the Court to consider is the scope of the arbitration agreements.

"As a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983). "In determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted." *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 846 (2d

Cir. 1987) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 622 n.9 (1985)).

The factual allegations in the complaint concern various alleged violations of the Fair Labor Standards Act (FLSA) and New York Labor Laws (NYLL)—allegedly docking pay for minor lateness, failing to pay employees for hours worked, failing to pay appropriate overtime, among other things.

The agreement to arbitrate "concerns any aspect, part, or portion of Employee's employment," and the final paragraph of the agreement provides that the employee "agrees to submit any claim or dispute describe above (or any other direct or indirect claim involving or arising from Employee's employment with the company) to arbitration."

The Plaintiffs' allegations clearly fall within this broad and inclusive arbitration agreement.

### B. Plaintiffs' Claims are Arbitrable

The third *Oldroyd* factor provides, "if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable." *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75 (2d Cir.1998).

After establishing that the parties agreed to arbitrate, "the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory right at issue." *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 258 (2009) (quotations omitted). "The burden of showing such legislative intent lies with the party opposing arbitration." *Oldroyd*, 134 F.3d at 78 (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991)).

There is no evidence that Congress intended FLSA claims to be non-arbitrable. *See Arrigo v. Blue Fish Commodities, Inc.*, 704 F. Supp. 2d 299, 304 (S.D.N.Y. 2010). Courts in this District have repeatedly found both FLSA and NYLL claims to be arbitrable. *Reynolds v. de Silva*, 2010 WL 743510 at *5 (S.D.N.Y. Feb. 24, 2010) (collecting cases).

### C. Plaintiffs' Lawsuit is Stayed Pending the Outcome of Arbitration

The final *Oldroyd* factor requires, "if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration." *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75–76 (2d Cir.1998).

When only a portion of a plaintiff's claims are arbitrable, "The decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket." *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 856 (2d Cir. 1987) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 20 n.23).

That is not the case here, as all of Plaintiffs' claims are arbitrable. However, Section 3 of the FAA provides that a court, upon the application of one of the parties, shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement. 9 U.S.C. § 3. Courts in this Circuit have concluded that "Courts have discretion to dismiss—rather than stay—an action when all of the issues in it must be arbitrated." *Milgrim v. Backroads, Inc.*, 142 F. Supp. 2d 471, 476 (S.D.N.Y. 2001).

In Defendants' motion to compel arbitration, they argued in the alternative that "pursuant to FAA § 3, Plaintiff's lawsuit must be stayed, in its entirety, pending the outcome of compulsory arbitration." (Docket # 47 at 3.) Upon Defendants' application, this Court will stay Plaintiffs' lawsuit pending the outcome of arbitration.

## V.   Plaintiffs' Outstanding Motion for Conditional Certification

On January 5, 2015, the Plaintiffs moved for conditional certification and facilitation of notice pursuant to FLSA section 216(b). (Docket # 52.)

That motion is denied as moot at this time.

Whether the parties will arbitrate as a class or on an individual basis is a question for the arbitrator, not the Court. *See Guida v. Home Sav. of Am., Inc.*, 793 F. Supp. 2d 611, 614-15 (E.D.N.Y. 2011).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the lawsuit and compel arbitration is GRANTED.

Plaintiffs' motion for conditional certification is DENIED as moot.

The Clerk of Court is directed to remove Docket entry # 46 and # 52 from the Court's open motions.

DATED: May 6, 2015

U.S.D.J.